# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| CHARLES EDWARD WERNERT, II, <br> *Plaintiff,* <br> v. <br> RYANT L. WASHINGTON, ET AL., <br> *Defendants*. | CIVIL NO. 3:09cv-00031 <br><br> MEMORANDUM OPINION <br><br> JUDGE NORMAN K. MOON |

This matter is before the Court on the Defendants' motion for summary judgment [docket no. 20]. Plaintiff alleges that his rights under the Eighth and Fourteenth Amendments of the U.S. Constitution were violated while he was in the custody of the Fluvanna County Police Department. Additionally, Plaintiff alleges Virginia state law claims of assault and battery and gross negligence. For the reasons that follow, the Court will grant in part and deny in part Defendants' motion.

## I. FACTUAL SUMMARY[1]

### A. Background

The Plaintiff in this case, Charles Edward Wernert, II ("Plaintiff"), is a resident of Pennsylvania who visited Fluvanna County in early May 2007. On May 4, 2007, Joshua Green ("Green"), a deputy with the Fluvanna County Police Department was on patrol with an auxiliary deputy, Francis Ferki. At 10:41 p.m., Deputies Green and Ferki heard radio traffic indicating that an individual had jumped in front of a moving ambulance on Kents Store Road. A minute

---

[1] The facts have been adduced from the record. I will introduce additional facts as necessary in my discussion.

later, the deputies heard radio traffic indicating that a man had committed an assault at 3428 Kents Store Road. The suspect in the assault was identified as an individual who was approximately 6 feet tall, weighing approximately 200 pounds, in a white tee shirt and blue jeans. He was described as walking down the road carrying one or two suitcases. The deputies were in the vicinity of 3428 Kents Store Road; they responded to the call and proceeded to that location.

The deputies encountered Plaintiff, who matched the aforementioned description, near the address from which the call came. When Plaintiff saw the deputies approach his location, he picked up his bag and started walking away. The deputies stopped and talked with Plaintiff, who was intoxicated from alcohol consumption. Green asked for and was given Plaintiff's identification. Plaintiff told Green that he was on vacation from Pennsylvania, and that he was also on parole in Pennsylvania and was therefore not supposed to leave the state. The dispatcher informed Green that Plaintiff was a Pennsylvania parolee, and that Pennsylvania authorities requested that Fluvanna authorities hold Plaintiff until they could come pick him up. The deputies placed Plaintiff in handcuffs behind his back and drove him to the Fluvanna County Sherriff's Office.

In addition to speaking with Plaintiff, Green spoke with Chad Marshall, at whose home the reported assault had occurred on Kents Store Road. Marshall told Green that the Plaintiff had started to swing at people for no apparent reason, and had head-butted an individual who attempted to calm him down.

### B. Plaintiff's Allegations

Upon arriving at the Sherriff's Department for booking, Plaintiff's pockets were emptied and he was told that he would have to remove his belt and shoes. Plaintiff asked how he was supposed to remove his shoes while handcuffed, and was told to "figure it out" for himself.

(Plaintiff Dep. 58: 14-16). Plaintiff then manipulated his arms and hands in such a way that he was able to remove his belt. Defendant Green then told Plaintiff to "kick your shoes off." (Plaintiff Dep. 59: 3-7); (Ferki Dep. 61-62). Plaintiff stepped on the heel of his right shoe and kicked it off. He then attempted to do the same with his left shoe, but had trouble doing so, finding the shoe difficult to kick off. When he shook his foot to kick off the shoe, it "flipped up [], and it accidentally hit [Deputy Ferki] in the face." Plaintiff then apologized to Ferki for striking him in the face with the shoe. (Pl.'s Dep. 60: 5, 10-11). Plaintiff was then slammed to the ground, (Pl.'s Dep. 59:24-25), describing the take down as feeling like his "legs were taken out from underneath [him], and the upper body was thrown face first to the ground." (Pl.'s Dep. 59:24-25). Plaintiff recalls no further facts following being slammed to the ground, stating that "the next thing I knew, I woke up in a pool of blood." (Pl.'s Dep. 59:24-25).

Plaintiff was taken to the hospital for his injuries sustained from the take down. The medical report indicates that Plaintiff suffered multiple facial fractures, as well as impacted and displaced teeth. (Pl.'s Exhibit H, UVA Medical Reports). He received stitches for facial lacerations, his teeth were straightened and a wire splint was placed in his mouth. (*Id.*).

**C. Defendants' Version**

Upon arriving at the Sherriff's office, the deputies escorted Plaintiff into a holding cell. Deputy Green planned to remove Plaintiff's hand restraints once in the holding cell. (Green Dep. 81:18-19). According to Green, there was no reason to leave Plaintiff in hand restraints because Plaintiff "wasn't being disrespectful or aggressive . . . ." (Green Dep. 81:9-13). Indeed, Green states that, prior to Ferki being struck with the shoe, Green did not believe Plaintiff posed a threat to him or Ferki. (Green Dep. 90:16-19). Deputy Green then asked Plaintiff to remove his shoes and belt. (Green Dep. 86:9-12). Green also informed Plaintiff that while Plaintiff was removing his shoes and belt, Green was going to remove the hand restraints. (Green Dep. 86:13-

3

18). As Plaintiff kicked his shoe off, he turned toward the direction of Deputy Ferki. (Green Dep. 87:2-4). Plaintiff then kicked his shoe off, and it struck Deputy Ferki in the right cheek. (Green Dep. 87:15-22). Green does not recall whether Plaintiff or Ferki said anything after Ferki was struck in the face with the shoe. (Green Dep. 89:8-14). According to Green, when Ferki was struck with the shoe, Deputy Green took Plaintiff to the floor using an "escort takedown maneuver." (Green Dep. 89:16-23). Green states that he took Plaintiff to the floor because

> at the time, he was a threat to me, as well as still a threat to Ferki. I was, you know, within a few inches, a foot of [Plaintiff]. [Plaintiff] had already been involved in one altercation that night. He appeared intoxicated at the time. Once you are on the ground, it eliminates the whole threat.

(Green Dep. 89-90). With regard to the threat posed to Green and Ferki that allegedly justified the take down, Green stated that he believed Plaintiff was a threat to "kick me, at the very least." (Green Dep. 90:8). Green described his actions in taking Plaintiff to the ground as "helping" Plaintiff or "assisting" Plaintiff to the ground, but did not recall saying anything to Plaintiff while taking him to the ground. (Green Dep. 96:14-15, 18-22). According to Green, he elected to use the escort takedown maneuver, rather than a "leg sweep take down," because a leg sweep take down, in Green's view, would have been more painful to Plaintiff, because he would have landed on the ground on his back with his arms handcuffed behind him, and thus could have broken his wrists or arms. (Green Dep. 108:9-19). Upon taking Plaintiff down, Green got on top of Plaintiff with a knee in Plaintiff's back. (Green Dep. 109:6-14). After taking Plaintiff to the ground, Green noticed blood that "had came out from around [Plaintiff's] face." (Green Dep. 4-8). Green observed Plaintiff's injuries, noting that "his eye was a little swollen and bruised. His lip was cut. He was bleeding from his nose as well." (Green Dep. 98:20-22).

4

### D. Additional Evidence

Ferki states that, after observing Plaintiff's condition, he suggested to Green that they call an ambulance. (Ferki Dep. 58: 9-17). Significantly, Deputy Ferki's statements provide additional support to Plaintiff's allegations. Ferki, who had been facing away from Plaintiff but was turning back around to look toward Plaintiff, stated that he felt an object strike his right cheek, and noted that it was Plaintiff's shoe. (Ferki Dep. 52-53). Ferki continued to turn toward Plaintiff and was about to say "nice shot." (Ferki Dep. 60:10-13). After Ferki was struck with Plaintiff's shoe, Ferki states that Green made the following statements to Plaintiff: "get on the ground"; that striking Ferki with the shoe was "assault on an officer"; and "don't be trying to assault my deputy." (Ferki Dep. 59:2-14).

Plaintiff has submitted the affidavit of Timothy Lynch, Plaintiff's expert regarding police defensive tactics. (Pl. Exhibit J). Lynch has degrees in police sciences, criminal justice, and administration of justice, and has over thirty-five years of experience as a patrol officer, corrections officer, trainer, instructor, and teacher in law enforcement. According to Lynch, Green's actions in using the "escort takedown maneuver"[2] were "more 'retaliatory,' rather than to 'overcome resistance,' and [Green's] conduct was not justified under the circumstances. Moreover, no reasonable law enforcement officer would have felt threatened under these circumstances to take someone in custody to the ground so violently." (Pl. Exhibit J at 3). Lynch also asserts that, "[a]s [Plaintiff] was in mechanical restraints and offering no resistance or physical or verbal aggression, it is improbable and unreasonable that either deputy felt any real jeopardy towards their own safety." (*Id.*).

---

[2] Plaintiff has submitted a diagram of the escort takedown maneuver, obtained from a defensive tactics handbook. (Pl. Exhibit I, Green Dep. 91-92). The diagram illustrates how to perform the maneuver on an individual who is not in hand restraints, whereas Plaintiff was in hand restraints when Green performed the maneuver on him.

5

In support of his assertion that Green's use of the escort takedown maneuver was not consistent with the purpose for which it was intended, Lynch stated the following:

> The application of [the escort takedown maneuver] requires the subject's controlled arm to be extended at a right angle to the body, with downward pressure directed to the triceps area of the arm just above the elbow. The subject is in a position to brace his fall with the "free" hand as the officer can control the angle and direction of the takedown to the prone position. In this manner, the subject's fall is directed to the chest and abdomen.
>
> Being that [Plaintiff] was handcuffed behind his back, as well as being physically impaired due to alcohol, it would be extremely difficult, if not improbable, for him to be able to brace his fall in a forward direction. It would be equally difficult for Deputy Green to be able to control [Plaintiff's] body weight during the takedown. It is highly improbable that Deputy Green would be able to "guide" [Plaintiff's] fall so carefully, as he was not in an advantageous position to manipulate the arm and overcome the forces of gravity. [Plaintiff's] "fate" was in Deputy Green's hands, and the forward motion of the takedown, in such a position, would most likely cause a subject to hit the floor face first, rather than chest first. This would be due to the upper body weight causing a "top-heavy" condition. Without an additional person to control the upper body on the other arm, it would be difficult to safely and carefully guide a handcuffed person to the floor. To allegedly overcome one's resistance, such a takedown would not be performed with such a slow and gentle motion, as claimed by the deputies.
>
> The need to stabilize a restrained subject such as [Plaintiff], who offered no resistance or signs of aggression, would not require the use of an Escort Takedown.

(*Id.* at 4).

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a court should grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that

6

is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 250. In considering a motion for summary judgment under Rule 56, the Court must view the record as a whole and draw reasonable inferences in the light most favorable to the nonmoving party. *See, e.g.*, *id.* at 248–50 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).

### III. DISCUSSION

#### A. Civil Rights Claims

Plaintiff's civil rights claims are brought solely against Defendant Green. Plaintiff alleges a deprivation of his rights under the Eighth and Fourteenth Amendments of the U.S. Constitution in violation of 42 U.S.C. §1983. Specifically, Plaintiff alleges that Deputy Green violated his Constitutional rights because Green subjected him to excessive force at the Fluvanna County Sherriff's Office. Section 1983 "is a federal statutory remedy available to those deprived of rights secured to them by the Constitution and, in a more sharply limited way, the statutory laws of the United States." *Phillips v. Pitt County Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). "One alleging a violation of section 1983 must prove that the charged state actor (1) deprived Plaintiff of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was performed under color of the referenced sources of state law found in the statute." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)). An analysis of an excessive force claim brought under §1983 must begin by "identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (citations omitted). "The validity of the claim must then be judged by reference to the specific constitutional standard which governs that

7

right, rather than to some 'excessive force' standard." *Id.* Thus, a proper analysis of Plaintiff's §1983 claims must address in turn each specific alleged constitutional provision.

### 1. Eighth Amendment Claim

Plaintiff's claims arose while he was in custody as a pretrial detainee. Excessive force claims brought by pretrial detainees are governed by the Fourteenth Amendment; unlike convicted prisoners, pretrial detainees cannot bring Eighth Amendment claims. *See Slade v. Hampton Roads Regional Jail*, 407 F.3d 243, 248 (4th Cir 2005) ("Although [Plaintiff's] complaint stated that he was being punished in violation of the Eighth Amendment, because [Plaintiff] was a pretrial detainee and not a convicted prisoner, the district court properly determined that [Plaintiff's] complaint should be analyzed under the Due Process Clause of the Fourteenth Amendment.") (citing *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244 (1983); *Riley v. Dorton*, 115 F.3d 1159, 1166 (4th Cir. 1997) (en banc) ("[E]xcessive use of force claims of pretrial detainees are governed by the Due Process Clause of the Fourteenth Amendment."). Because pretrial detainees cannot bring Eighth Amendment claims, the Court will grant the Defendants' motion for summary judgment as to Count I to the extent it attempts to state a claim under the Eighth Amendment.[3]

### 2. Fourteenth Amendment Claim

To succeed on an excessive force claim under the Due Process Clause of the Fourteenth Amendment, the Plaintiff must show that the Defendant "inflicted unnecessary and wanton pain and suffering." *Taylor v. McDuffie*, 155 F.3d 479, 483 (4th Cir. 1998) (citing *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). "The proper inquiry is whether the force applied was in a good faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing

---

[3] Plaintiff concedes this point, noting in his responsive brief that he "concurs with the [D]efendants that the Fourteenth Amendment governs [the Constitutional claims of] this case."

harm." *Id.* (citations omitted). In order to conclude that Plaintiff's due process rights were violated, "it is necessary to find that the officer's actions amounted to punishment and were not merely 'an incident of some other legitimate government purpose,' and that the injury resulting from their actions was more than de minimis." *Robles v. Prince George's County, Md.*, 302 F.3d 262, 269 (4th Cir. 2002) (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)).

"In determining whether [this] constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, and whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm." *Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Not every "push or shove, even if it may later seem unnecessary" is serious enough to rise to the level of a constitutional violation. *Orem*, 523 F.3d at 447 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Indeed, the threshold for excessive force liability under §1983 is higher than that of a normal tort action, and it is clear that "agents of the state are permitted to exercise a certain degree of force in order to protect the interests of society." *Justice v. Dennis*, 834 F.2d 380, 382 (4th Cir. 1987).

I conclude that a genuine issue of material fact exists with regard to whether the force applied to Plaintiff in this case was excessive. In particular, the relationship between the need and amount of force used when Defendant Green took Plaintiff to the ground and injured him, the extent of Plaintiff's facial injuries, and the seemingly minimal threat to order or discipline caused by Plaintiff kicking off his shoe all suggest that a constitutional violation occurred. Notably, at the time Defendant took Plaintiff to the ground and caused him severe facial injury, Plaintiff was handcuffed with his arms behind his back, and had not demonstrated any aggression toward either Defendant or the other deputy present. Although Deputy Green

9

described the threat he allegedly perceived in Plaintiff's actions, Green's own statements undermine his contention that Plaintiff in fact posed an imminent threat to either deputy. Indeed, Deputy Green acknowledged as much, stating that Plaintiff "wasn't being disrespectful or aggressive." (Green Dep. 81:9-13). Given that, by Green's own admission, Plaintiff posed no threat prior to kicking off his shoe, and that Plaintiff was restrained such that his ability to constitute a "threat" was necessarily limited at the time he kicked off his shoe, a reasonable fact-finder could conclude that the "shoe incident" alone fails to support the level of threat that Green contends existed.

Deputy Ferki's reaction to being struck by Plaintiff's shoe further suggests that a fact-finder could conclude that there was little relationship between the need for force and the amount of forced used. In contrast to Green's response, Deputy Ferki, the victim of the allegedly threatening action, appeared to brush off the incident entirely. Moreover, the statement submitted by Plaintiff's expert, Lynch, further supports the conclusion that the amount of force used was well beyond what was required. Lynch asserts that, "[a]s [Plaintiff] was in mechanical restraints and offering no resistance or physical or verbal aggression, it is improbable and unreasonable that either deputy felt any real jeopardy towards their own safety." (Pl. Exhibit J at 3). A fact-finder could believe Plaintiff's assertion that the escort takedown maneuver was not employed; rather, Plaintiff's legs were "taken out from under him" as he was slammed face-first to the floor. Additionally, the record indicates that Plaintiff suffered significant injuries.

Viewing the facts as I must, I conclude that a reasonable juror could find that Green's actions constituted punishment of the Plaintiff, and that Plaintiff suffered unnecessary and wanton pain at Green's hands. A jury could reasonably infer that Green's actions were not a "good faith effort to main or restore discipline." *Orem*, 523 F.3d at 446. Accordingly, to the

extent that Defendant's motion for summary judgment argues that there are no facts to support a finding that a constitutional violation occurred, his motion will be denied.

### 3. Qualified Immunity

Defendant Green argues that he is protected by qualified immunity. Qualified immunity protects a government official from liability in §1983 actions arising from the performance of discretionary actions. It applies so long as the official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The goal of qualified immunity doctrine is to balance two important concerns, first "the need to hold public officials accountable when they exercise power irresponsibly" and second "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

In deciding whether a defendant is entitled to qualified immunity, the Court must examine: (1) whether the facts, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right; and, (2) if so, whether the conduct was objectively reasonable in light of a then clearly-established right. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). At the time of the alleged constitutional violation, it was clearly established that an arrestee or pretrial detainee is protected from the use of excessive force. *See, e.g.*, *Orem*, 523 F.3d at 448 (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). Therefore, because the right to be free from excessive force is clearly established, the final inquiry in this qualified immunity analysis is whether a reasonable officer in Defendant's position could nevertheless have believed that his actions were lawful.

The final inquiry is an objective one, dependent not on the subjective beliefs of the particular officer at the scene, but instead on what an objectively reasonable officer would have

understood in those circumstances. *Milstead v. Kibler*, 243 F.3d 157, 161 (4th Cir. 2001). "Because 'police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving,' the facts must be evaluated from the perspective of a reasonable officer at the scene, and the use of hindsight must be avoided." *Waterman v. Batton*, 393 F.3d 471, 476-77 (4th Cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). The law therefore shields police officers from civil liability unless the officer reasonably should have known that his actions violated clearly established constitutional rights. *Harlow*, 457 U.S. at 818.

Notwithstanding the qualified immunity doctrine's ample room for mistaken judgments, the facts viewed in the light most favorable to Plaintiff indicate that the force used in these circumstances was not objectively reasonable. The preceding Fourteenth Amendment analysis suggests that Defendant's actions were far beyond what was reasonably necessary at the time. Therefore, I conclude that Defendant Green is not entitled to qualified immunity. His motion for summary judgment on qualified immunity grounds will accordingly be denied.

**B. State Law Claims**[4]

**1. Assault and Battery**

In Virginia, the tort of assault is "an intentional offer to touch the person of another that created in the mind of the victim a reasonable apprehension of an immediate battery." *Park v. Shiflett*, 250 F.3d 843, 852 (4th Cir. 2001) (citing *Epps v. Commonwealth of Virginia*, 28 Va. App. 58 (1998)). "The tort of battery is an unwanted touching which is neither consented to, excused, nor justified." *Koffman v. Garnett*, 265 Va. 12, 16 (2003) (citations omitted). Either an assault or battery is permitted when justified in the performance of a law enforcement officer's duties. *See McLenagan v. Karnes*, 27 F.3d 1002, 1009 (4th Cir. 1994). "Officers, within

---

[4] Plaintiff has filed state law claims against both Deputy Green and Sherriff Washington.

reasonable limits, are the judges of the force necessary to enable them to make arrests, to prevent escapes, and to deliver prisoners where they are required by law or by warrant to deliver them." *Davidson v. Allam*, 143 Va. 367, 373 (1925). "When acting in good faith, the courts will afford [law enforcement officers] the utmost protection, and they will recognize the fact that emergencies arise when they are not expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigations in court." *Id.* Indeed, "Virginia law recognizes that police officers are legally justified in using reasonable force to execute their lawful duties." *Ware v. James City County, Virginia*, 652 F.Supp.2d 693, 712 (E.D.Va. 2009) (citing *Pike v. Eubank*, 197 Va. 692 (1956)). Accordingly, if reasonable force is used by police officers in execution of their lawful duties, they are immune from suit for such acts. *Id.*

With regard to Defendant Washington's possible liability, counsel for the Defendants properly conceded at oral argument that a sheriff in Virginia can be held liable for the acts of his deputies. *See, e.g.*, *Bell v. City of Roanoke Sherriff's Office*, No. 7:09-CV-00214, 2009 WL 5083459, at *5 (W.D.Va. December 23, 2009) (in Virginia "'the acts . . . of the deputy, colore officii, are considered in law as the acts . . . of the sheriff.'") (quoting *Miller v. Jones*, 50 Va. (9 Gratt.) 584, 603 (1853)); s*ee also Verry v. Barry*, 71 Va. Cir. 318, 2006 WL 2578368, at *1 (Va. Cir. Ct. July 27, 2006) ([A] Sheriff may be held responsible for the acts of his deputies."); *Moore's Administrator v. Dawney and Another, Administrators of Bell*, 13 Va. 127, 132 (1808) ("The law looks upon the Sheriff and his officers as one person: he is to look to his officers that they do their duty; for if they transgress, he is answerable to the party injured by such transgression; and his officers are answerable over to him.").

### a. Assault

Turning first to the assault claim, I conclude that Plaintiff's claim lacks merit. There are no facts presented to suggest that Defendant Green created within the Plaintiff an apprehension

of an immediate battery. The facts demonstrate that Defendant instructed the Plaintiff to "get on the ground" and "don't be assaulting my deputies" *while* he was physically taking him to the ground. It is not at all clear that Plaintiff even heard these commands, much less heard them before Deputy Green took him to the ground.[5] Just before taking Plaintiff to the ground, Defendant Green was standing behind Plaintiff, thus not allowing Plaintiff any opportunity to perceive Defendant's immediate contact. Because there is no evidence of any apprehension of an immediate battery, I conclude that Plaintiff's claim of assault is unfounded. Accordingly, summary judgment will be granted as to that count.

### b. Battery

Turning next to the alleged battery, I conclude that a reasonable juror could find that a battery occurred. For the reasons stated above and viewing the facts as I must, I conclude that a genuine issue of material fact exists regarding whether the forced used against Plaintiff was reasonably necessary under the circumstances, that is, whether the alleged battery was "reasonable . . . in execution of . . . lawful duties." *Ware*, 652 F.Supp.2d at 712. Accordingly, the Defendants' motion for summary judgment as to the battery is denied.

### 2. Gross Negligence

"Gross negligence is that degree of negligence which shows and utter disregard of prudence amounting to complete neglect of the safety of another. It is a heedless and palpable violation of legal duty respecting the rights of others." *Frazier v. Norfolk*, 234 Va. 388, 393 (1987) (citations omitted). Gross negligence amounts to the absence of slight diligence, or the want of even scant care. *Id.* (citing *Town of Big Stone Gap v. Johnson*, 184 Va. 374, 378 (1945)). The determination of gross negligence is an issue of fact properly decided by a jury.

---

[5] In his deposition, Plaintiff states that after he hit Deputy Ferki with his shoe, he apologized to Ferki and then was "taken down from behind from nowhere. I didn't know where it came from or nothing." (Pl.'s Dep. 60: 6-7).

*See Koppel v. Morgan, et al.*, 41 Va. Cir. 130, 132 (Cir. Ct. Fairfax 1996), *citing Chapman v. City of Virginia Beach*, 252 Va. 186 (1996). *See also Glasco v. Ballard*, 249 Va. 61, 65 (1995) (holding that a claim of gross negligence against a deputy should proceed to a fact-finder because "reasonable minds could differ whether [the defendant's] conduct amounted to gross negligence.").

For the reasons stated previously, the evidence viewed in the light most favorable to Plaintiff establishes that there is a genuine issue of fact regarding whether Defendant Green was grossly negligent in his takedown of Plaintiff. Accordingly, Defendants' motion for summary judgment as to the gross negligence count will be denied.

### IV. CONCLUSION

For the reasons stated herein, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment [docket no. 20]. An appropriate Order will follow.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

ENTERED: This 11th Day of March, 2010

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE